**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

APR 2 7 2016

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES, | ) |
| v. | ) |
| ALVIN GLASGOW , | )  Criminal Action No. 1:15-cr-222-1 |
| *Defendant.* | ) |

## Memorandum Opinion

This matter comes before the Court on Defendant Alvin Glasgow's Rule 29(c) Motion for Acquittal. The Court held a hearing on this Motion on April 25, 2016. For the reasons outlined below, and as stated in Court, the Court ORDERS that the Motion is DENIED.

### I. Background

On November 23, 2015, after a five-day jury trial, Alvin Glasgow was convicted by a jury of his peers of ten counts:[1]

- Count One: conspiracy to distribute controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 846;

- Counts Two, Three, and Four: distribution of 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1);

- Counts Five, Eight, Nine, Ten, and Fourteen: possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c); and

- Count Twenty-five: possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).

In early December of 2015, Glasgow filed four motions, *pro se*, for judgment of acquittal.[2] Dkt. Nos. 76-80. On December 16, 2015, Glasgow's trial counsel filed a motion to withdraw, Dkt.

---

[1] A full statement of the facts supporting these Glasgow's convictions is set forth in the government's brief in opposition to the Motion. Dkt. No. 129. The Court adopts this statement of facts as it finds it to be accurate.

No. 81, which the Court granted. Dkt. No. 83. The Court then appointed Glasgow new counsel. Dkt. No. 86. The Court also granted Glasgow's new counsel four weeks from the date the trial transcripts were produced to brief the Rule 29 motion for acquittal. Dkt. No. 88. The trial transcripts were produced on February 22, 2016. Dkt. No. 107-13. The Motion was fully briefed by the parties and a hearing was held on the motion on April 25, 2016.

## II. Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29") provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal" where the defendant has successfully challenged the sufficiency of the evidence used to convict him. Fed. R. Crim. P. 29(c)(2). A defendant making a Rule 29 motion challenging the sufficiency of the evidence carries a heavy burden. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir.1997) (citation omitted). The Fourth Circuit has dictated that, in analyzing a Rule 29 motion, a district court should inquire whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Johnson*, 55 F.3d 976, 979 (4th Cir. 1995) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court should also give deference to the trier of fact. *Id.* This requires the court to "construe the evidence in the light most favorable to the Government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." *Id.*

## III. Analysis

### A. Whether the evidence is insufficient to sustain the verdict as to Counts Five and Eight through Ten because Mr. Glasgow did not participate in a substantive 18 U.S.C. 924(c) offense

Glasgow first argues that he should be acquitted of Court Five, Eight, Nine, and Ten, which charge him with violations of 18 U.S.C. § 924(c), on the grounds that he did not actually

---

[2] These three motions will be treated as one motion asserting several arguments in support of acquittal.

commit or participate in the substantive violations of that statute.  Section 924(c)(1) criminalizes

"us[ing] or carr[ying] a firearm" during any violent or drug trafficking crime. *United States v. Camps*, 32 F.3d 102, 107 (4th Cir. 1994).  "A defendant who has 'used' or 'carried' a firearm on

several separate occasions during the course of a single continuing offense . . . has committed

several section 924(c)(1) offenses," which can be punished with multiple consecutive sentences.

*Id.* at 107-08.  A conspiracy to commit a violent crime or a drug trafficking crime can be the

predicate offense for a § 924(c) conviction. *United States v. Blackman*, 746 F.3d 137, 141-42

(4th Cir. 2014) (citing *United States v. Ashley*, 606 F.3d 135, 142–43 (4th Cir. 2010)).  Under the

*Pinkerton* doctrine,[3] a defendant can be convicted of a violation of § 924(c) if the defendant

joined a predicate conspiracy and "the use of a firearm was both reasonably foreseeable to him

and in furtherance of the goals of the conspiracy." *Id.*

Defendant argues that "separate § 924(c) charges may not be stacked for each

conspiratorial activity." Dkt. No. 126, at 3.  The cases Defendant cites in support of this

argument were overruled by the Fourth Circuit, as stated above, in *United States v. Camps*, 32

F.3d 102 (4th Cir. 1994).  The *Camps* court explained that by allowing multiple convictions for

multiple uses of firearms throughout the course of a lengthy conspiracy "best achieves section

924(c)(1)'s unmistakable objective of 'persuad[ing] the man who is tempted to commit a federal

Felony to leave his gun at home.'" *Id.* (quoting 114 Cong. Rec. 22231 (1968)).

Defendant also argues that, as a matter of law, he is not guilty of § 924(c) violations

because he did not actually use or carry a firearm in furtherance of a conspiracy.  Rather,

Glasgow asserts that his co-defendant, Elijah Mayson, was the only one who brought firearms to

meetings with Detective Cupka.  This position is in direct conflict with the Fourth Circuit's

---

[3] The *Pinkerton* doctrine provides that a defendant is "liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012).

holding in *United States v. Blackman*, 746 F.3d 137 (4th Cir. 2014). The defendant in *United States v. Blackman* was convicted of two counts: conspiracy to commit robbery and a violation of 18 U.S.C. § 924(c), using or carrying a firearm during and in relation to a crime of violence. *Id.* at 140. The Fourth Circuit found the defendant was properly convicted of a § 924(c) violation, under the *Pinkerton* doctrine, even though the defendant himself did not use or carry a firearm in relation to the conspiracy nor was he present when his co-conspirators brandished a firearm in furtherance of the conspiracy. *Id.* at 141-42. The conviction was proper because the evidence clearly demonstrated that Blackman not only joined the alleged conspiracy, but that the use of a firearm was both reasonably foreseeable to him and in furtherance of the goals of the conspiracy." *Id.* The evidence in this case similarly shows that Mayson's use of a firearm on multiple occasions was reasonably foreseeable to Glasgow and done in furtherance of the conspiracy. The Court will specifically address the factual basis of each of the four Counts Glasgow contests on these grounds.

### 1. Count Five

Count Five charges that on or about February 3, 2011, Mayson and Glasgow used and carried a firearm during and in relation to a conspiracy to distribute controlled substances. The government established, through the testimony Detective Cupka, that on February 3, 2011, Mayson and Glasgow met with Cupka and two other undercover officers at a storage facility on Eisenhower Avenue in Alexandria, Virginia. TT 139-41, 143. Mayson arrived first and brought marijuana, ecstasy pills, a pump shotgun, and a Taurus nine millimeter handgun with two magazines. *Id.* at 139-40. Glasgow arrived shortly thereafter and brought one vial of PCP. *Id.* at 141. With Mayson and Glasgow present, Cupka assessed all the items the two had brought, assigning a value for each particular item, in order to determine how many untaxed cigarettes the

4

items were worth. *Id.* These facts establish that Glasgow knew his co-conspirator Mayson used or carried a firearm during a transaction in furtherance of their ongoing conspiracy to distribute controlled substances. Glasgow was, accordingly, properly convicted of Count Five.

### 2. Count Eight

Count Eight charges that on or about March 24, 2011, Mayson and Glasgow used and carried a firearm during and in relation to a conspiracy to distribute controlled substances. The government proved, through the testimony Detective Cupka, that Glasgow and Mayson arranged to meet Cupka to exchange "eight firearms, cocaine, marijuana, Ecstasy pills, and cash" on March 24, 2011. *Id.* at 173-74. On the day of the meeting, Glasgow arrived before Mayson and began talking to Cupka. Glasgow stated he had $8,500 in cash and pulled an Uzi firearm out of the trunk of his car. *Id.* Glasgow also told Cupka that he could trade heroin in the future. *Id.* Shortly thereafter, Mayson arrived and handed Cupka a bag that contained marijuana and a Taurus .357 revolver. *Id.* at 175. Cupka told Glasgow and Mayson that he had not brought anything to exchange. *Id.* at 174, 176. Nevertheless, Cupka took the marijuana, the revolver, and the Uzi, telling Glasgow and Mayson that the items were insufficient to cover the debt they owed for untaxed cigarettes Cupka had previously given them. *Id.* at 176-77. These facts establish that Glasgow himself used or carried a firearm in furtherance of the conspiracy and he knew his co-conspirator Mayson used or carried a firearm in furtherance of their ongoing conspiracy to distribute controlled substances. Glasgow was, accordingly, properly convicted of Count Eight.

### 3. Count Nine

Count Nine charges that on or about April 7, 2011, Mayson and Glasgow used or carried a firearm during and in relation to the ongoing conspiracy to distribute controlled substances.

The government again established, through the testimony of Detective Cupka, that Mayson and Glasgow arranged to meet with Cupka on April 7, 2011, to exchange money, cocaine, ecstasy, and a .45 caliber handgun for untaxed cigarettes. *Id.* at 229. On April 7, 2011, the three met at the Eisenhower storage facility. *Id.* at 229-30. At the meeting, in Glasgow's presence, Mayson gave Cupka a Ruger .45 caliber pistol and ecstasy pills. *Id.* at 231-34. There was a discussion of how much these items were worth, and Mayson and Glasgow then pooled their money to cover the remaining amount that was owed to Cupka for the cigarettes he provided. *Id.* These facts again establish that Glasgow knew his co-conspirator Mayson used or carried a firearm in furtherance of their ongoing conspiracy to distribute controlled substances. Glasgow was, therefore, properly convicted of Count Nine.

### 4. Count Ten

Count Ten charges that on or about April 28, 2011, Mayson and Glasgow used or carried a firearm during and in relation to the ongoing conspiracy to distribute controlled substances. The government again established, through the testimony of Detective Cupka, that Mayson and Glasgow arranged to meet with Cupka at the Eisenhower storage facility on April 28, 2011. *Id.* 236. Mayson arrived first, bringing marijuana and a Norinco SKS rifle. *Id.* 239. Glasgow then arrived and handed Cupka ecstasy pills. *Id.* The three then discussed the value of each of the items the two had brought and how many untaxed cigarettes they were worth. *Id.* Cupka then gave Mayson and Glasgow the appropriate number of cigarettes, which were loaded into Mayson and Glasgow's vehicles. *Id.* These facts again establish that Glasgow knew his co-conspirator Mayson used or carried a firearm in a transaction in furtherance of their ongoing conspiracy to distribute controlled substances. Glasgow was, therefore, properly convicted of Count Ten.

6

Even though Glasgow did not himself bring a firearm to all of the above described

transactions with Cupka, it was reasonably foreseeable that Mayson would do so.  Glasgow had

discussions with Cupka and Mayson over the phone, through text messages, and in person, about

trading firearms and drugs for untaxed cigarettes.  Further, Glasgow was present at multiple

transactions in which firearms were present or traded and Glasgow participated in negotiations

over their worth.  Finally, the evidence was sufficient to establish that the provision of firearms

in the above described transactions was in furtherance of the conspiracy.  Glasgow was therefore

properly convicted of Counts Five, Eight, Nine, and Ten under the Fourth Circuit application of

the *Pinkerton* doctrines to § 924(c) violations.

### B. Whether the evidence was insufficient as a matter of law as to Counts Five, Eight, Nine, Ten, and Fourteen because the separate drug and gun sales were not the type of "use" or "carry" of a firearm contemplated by § 924(c)

Glasgow next argues that the sale of guns to detective Cupka in exchange for untaxed

cigarettes does not constitute using or carrying a firearm "during and in relation to . . . [a] drug

trafficking crime," as defined in § 924(c).  A conviction under § 924(c) requires the government

to prove that (1) the defendant used or carried a firearm, and (2) the defendant did so during and

in relation to a drug trafficking offense or crime of violence," *United States v. Mitchell*, 104 F.3d

649, 652 (4th Cir. 1997), or that (1) the defendant possessed a firearm (2) in furtherance of a

drug trafficking crime.  *United States v. Perry*, 560 F.3d 246, 254 (4th Cir. 2009); 18 U.S.C. §

924(c).

The Supreme Court has explained that "use" of a firearm means "active-employment."

*Bailey v. United States*, 516 U.S. 137, 148, 116 S. Ct. 501, 508, 133 L. Ed. 2d 472 (1995).  This

definition "includes brandishing, displaying, bartering, striking with, and, most obviously, firing

or attempting to fire a firearm. . . . [E]ven an offender's reference to a firearm in his possession

7

could satisfy § 924(c)(1)." *Id.* Thus, the use of a firearm in this context is much broader than discharging the firearm or brandishing it as a threat. The Supreme Court has also broadly construed the "in relation to" requirement. *Smith v. United States*, 508 U.S. 223, 237, 113 S. Ct. 2050, 2058, 124 L. Ed. 2d 138 (1993). At a minimum, "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Id.* This requirement can be met by showing that the firearm facilitated or had the potential of facilitating the drug trafficking crime. *Id.*

The facts in *United States v. Lipford*, 203 F.3d 259, 264 (4th Cir. 2000), are very close to this case. In *Lipford*, a government informant sought to purchase both a firearm and drugs from the defendant in exchange for cash. *Id.* After several transactions in which the informant and defendant exchanged only drugs, the two met and completed the exchange of both crack and a .25 caliber pistol. *Id.* At this transaction, the defendant "first handed [the informant] the handgun, then gave him thirteen and one-half grams of crack." *Id.* The informant then "passed Lipford $750, then paid Lipford the remaining $40, the balance due for the firearm." *Id.* The *Lipford* court found the "gun's involvement in the drug transaction [was not] 'spontaneous' or 'co-incidental'"; rather, the firearm "sweetened the pot" and facilitated the drug transaction. *Id.* at 267.

Similarly here, Mayson and Glasgow discussed and arranged trading firearms and drugs with Cupka on several occasions over phone, by text message, and in person. The parties negotiated over the value of the firearms and, ultimately, Mayson and Glasgow pooled both firearms and drugs together and exchanged them in the same transaction for untaxed cigarettes. These facts demonstrate that the production of guns was not spontaneous or coincidental. This is more than enough for a rational jury to find a use or carry of a firearm during and in relation to a

drug trafficking offense. *See also United States v. Latham*, 578 F. App'x 312, 315 (4th Cir. 2014) ("Selling guns and drugs in the same transaction constitutes 'use' of firearm in the context of § 924(c).").

Glasgow insists that *United States v. Wilson*, 115 F.3d 1185 (4th Cir. 1997) dictates that he must be acquitted on the § 924(c) convictions. In *Wilson*, the government established the following facts regarding Laughlin, a government informant, and Wilson, the defendant:

> (1) Laughlin went to Wilson's apartment with the express intent to purchase more marijuana; (2) Wilson offered to sell Laughlin as much marijuana as he needed; (3) while Wilson negotiated the sale of marijuana to Laughlin, he removed an unloaded twenty-two caliber semiautomatic rifle from a box in his closet and offered to sell it to Laughlin; and (4) Laughlin purchased only the rifle.

*Id.* at 1191. The Fourth Circuit overturned Wilson's conviction of a § 924(c) violation because his "sale of the firearm neither facilitated nor had the potential of facilitating his marijuana sales." *Id.* This case is distinguishable on several grounds. First, unlike in this case, Laughlin and Wilson never discussed or arranged for the sale of the rifle before meeting. *See id.* Rather, the defendant in *Wilson* spontaneously offered to sell a gun separate from the sale of marijuana. *Id.* In this case, Glasgow and Mayson discussed trading drugs and firearms together with Cupka and other undercover agents many times before meeting and completing the transactions. Second, the defendant in *Wilson* offered to sell the gun separate from the sale of marijuana and the evidence showed the presence of the firearm did not influence Laughlin's decision of whether or not to purchase marijuana. *Id.* In this case, Mayson and Glasgow pooled their guns and drugs together and a reasonable jury could have concluded based on the evidence that the inclusion of the firearms in the transactions "sweetened the pot," thus facilitating the transactions. Finally, in *Wilson*, no drug transaction was ever completed; thus, a jury could not reasonably conclude that a firearm facilitated a drug transaction that never occurred. *Id.* In this

case, firearms and drugs were traded together on multiple occasions. For all of these reasons, this case is drastically different than the facts in *Wilson*.

Construing the facts in the light most favorable to the government, a reasonable jury could easily find that Glasgow, or his co-conspirator Mayson, used or carried a firearm during and in relation to a drug trafficking offense in each of the transactions supporting Glasgow's convictions on Counts Five, Eight through Ten, and Fourteen.

### 1. Counts Five and Eight Through Ten

The facts supporting Counts, Five Eight through Ten are described in detail in the previous section. The Court finds no need to rehash those facts here as each of those Counts is based on an event during which Mayson and Glasgow traded drugs and at least one firearm to obtain untaxed cigarettes from Cupka. As explained above, this use of a gun is sufficient to satisfy the requirements of §924(c).

### 2. Count Fourteen

Count Fourteen charges that on or about June 28, 2011, Glasgow used and carried a firearm during and in relation to a conspiracy to distribute controlled substances. The government established, through the testimony of Detective Cupka, that Glasgow arranged to meet with Cupka on June 28, 2011, to exchange prescription narcotics, heroin, a firearm, and currency for untaxed cigarettes. TT 257. On that day, Glasgow came alone to meet Cupka and Special Agent Brady at the Eisenhower storage facility. *Id.* Glasgow brought a Norinko SKS rifle with an obliterated serial number, heroin, diazepam, and $12,000 in cash. *Id.* Glasgow exchanged these items for 1,200 cartons of untaxed cigarettes. *Id.*

Like the transactions supporting Counts Five and Eight through Ten, this transaction shows the requisite use or carry of a firearm during and in relation to a drug trafficking offense.

10

Glasgow bartered the firearm as a component of the deal which also involved the trade of drugs. The deal was discussed beforehand and the presence of the gun was by no means spontaneous or coincidental. The Court, therefore, concludes that a reasonable jury could easily find Glasgow guilty of Count Fourteen.

### C. Whether the evidence is insufficient to sustain the verdict as to Count Fourteen because the firearm listed in Count Fourteen was inoperable, and the evidence did not show it could readily be converted to expel a projectile

Glasgow argues that he should be acquitted of Count Fourteen because the gun that was traded in the transaction that supports Count Fourteen does not meet the definition of "firearm." The government had the burden to show that Glasgow used, carried, or possessed a "firearm" as defined in the statute. "Firearm" is defined in the statute as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C.A. § 921(a)(3). The jury was advised of this definition.

Count Fourteen was based on Glasgow providing Cupka with a Norinko SKS rifle during a trade on June 28, 2011. TT 259, Gov. Ex. 25-4. Glasgow argues that the weapon he provided to Cupka on June 28, 2011, is not a "firearm" as defined in the statute because it was missing a firing pin and thus could not be readily converted to expel a projectile. This argument is baseless and the Defendant admits this was a mistake in his reply brief.

At trial, the government presented the expert testimony of Walter Dandridge, an expert in firearms and toolmark examination, who testified about the Norinko SKS rifle. TT 489, 497-98, 500. Dandridge testified that this rifle was test fired twice and he determined that, in his expert opinion, the rifle was designed to or could be readily converted to expel a projectile by action of

an explosive. *Id.* at 497-98, 500. The government also presented the testimony of Arnold

Esposito, another expert in firearms and toolmark examination. *Id.* at 511. Esposito testified

that he examined and test fired the Norinko SKS rifle. *Id.* at 512. Glasgow did not contest the

government's evidence and at no point did anyone present evidence that the Norinko SKS was

missing a firing pin.

Dandridge did testify that Defense Exhibit 36-6, a Makarov nine millimeter pistol, which

he examined, was missing a firing pin. *Id.* at 497-99. Glasgow gave Cupka this Makarov pistol

in exchange for untaxed cigarettes on December 5, 2011. *Id.* at 551. The trade of this pistol did

not form the basis of Count Fourteen.

The Court finds the Norinko SKS rifle was the firearm that formed the basis of Count

Fourteen. The Court further finds that the government established that the Norinko SKS rifle

was a "firearm" as defined in the statute because the rifle was designed to or could be readily

converted to expel a projectile by action of an explosive and it was not missing a firing pin. The

government, therefore, met its burden and Glasgow was properly convicted of Count Fourteen.

### D. Whether Mr. Glasgow was entrapped as a matter of law

Glasgow next argues that he must be acquitted because he was entrapped, as a matter of

law, to commit the crimes of which he has been convicted. "Entrapment is an affirmative

defense consisting of 'two related elements: government inducement of the crime, and a lack of

predisposition on the part of the defendant to engage in the criminal conduct.'" *United States v.*

*McLaurin*, 764 F.3d 372, 379 (4th Cir. 2014) (quoting *Mathews v. United States*, 485 U.S. 58, 63

(1988)). "[T]he defendant has the initial burden to 'produce more than a scintilla of evidence

that the government induced him to commit the charged offense.'" *United States v. Sligh*, 142

F.3d 761, 762 (4th Cir. 1998) (quoting *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993)).

If the defendant meets this burden, "the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Id.*

The case law draws a line between inducement and solicitation. Inducement "involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *Id.* Solicitation involves the mere "provision of an opportunity to commit a criminal act." *Id.* (quoting *Daniel*, 3 F.3d at 778). A defendant fails to meet his burden on the entrapment defense if he shows only governmental solicitation and fails to present any evidence of inducement.

In determining whether a defendant was predisposed to commit a crime, the Court looks at "the defendant's state of mind before government agents make any suggestion that he shall commit a crime." *McLaurin*, 764 F.3d at 381 (quoting *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991)). "[T]he focus of the predisposition inquiry is on whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Id.* (citations and quotations omitted).

After considering all the evidence presented at trial in the light most favorable to the government, the Court cannot conclude that the government induced Glasgow to commit the crimes charged. The Court also must conclude that the evidence supports a jury conclusion that Glasgow was predisposed to commit these crimes. Glasgow first met the undercover officers on October 20, 2010. On that day, Mayson, who had already been dealing with Cupka, brought Glasgow and introduced him to the undercover officers. At that meeting, the first time they met, before the government had any communications with him, Glasgow provided ecstasy pills for trade and proposed importing cocaine from Guyana to trade with the agents. This specifically demonstrates a lack of inducement on the part of the government. Next, over the course of their

dealings, Glasgow repeatedly brought up, on his own, his plan to import cocaine from Guyana and his interest in smuggling heroin from Canada. Although he never actually did so, these remarks are evidence of Glasgow's predisposition. Further, throughout their dealings, the undercover officers told Glasgow they were willing to accept cash in exchange for untaxed cigarettes instead of drugs or firearms. Nevertheless, Glasgow continually offered to provide different kinds of drugs, and eventually firearms, as a form of payment. This evidence shows the government did not induce or pressure Glasgow to continue providing them with guns or drugs. Glasgow's initiative in proposing to pay using different kinds of drugs further supports a finding that he was predisposed to commit the crimes charged.

Glasgow's primary argument in support of his position is that the undercover officers asserted coercive pressure on him by maintaining a continuing debt with him and making him feel as though he could not cease providing drugs and firearms until his accounts were settled. The Court is not persuaded by this argument. First, the evidence shows Glasgow began to deal with the officers on his own volition and went into debt to the officers on his volition. Second, the officers made clear that Glasgow could repay this debt with cash, rather than drugs or firearms. Finally, beyond Glasgow's own statements regarding this pressure, there is no evidence that excessive pressure was placed on Glasgow to repay these debts.

The Court, therefore, concludes that that Glasgow was not entrapped as a matter of law.

E. Whether the Government engaged in sentencing entrapment as a matter of law

Glasgow next argues that he should be acquitted because the government engaged in sentencing entrapment or sentencing manipulation as a matter of law. Specifically, Glasgow argues that he should be acquitted because the government engaged in outrageous conduct that

offends due process by inducing him to sell high quantities of drugs and firearms for over four years.

Sentencing entrapment and sentencing manipulation are distinct but related theories. *United States v. Jones*, 18 F.3d 1145, 1152 (4th Cir. 1994). It is not entirely clear from Glasgow's briefs what theory he is pursuing. "Sentencing entrapment requires that a defendant be devoid of criminal predisposition." *United States v. Atwater*, 336 F. Supp. 2d 626, 630 n. 2 (E.D. Va. 2004) (citing *Jones*, 18 F.3d at 1153). "Sentencing manipulation, on the other hand, requires government conduct so outrageous that it treads over due process, but it does not necessarily require that a defendant be devoid of criminal predisposition." *Id.* (citing *Jones*, 18 F.3d at 1153). As described in the previous section, the Court has already determined that Glasgow was predisposed to commit the crimes charged. The Court, therefore, need not further address the sentencing entrapment theory. The Court will instead focus its analysis on the sentencing manipulation theory.

The Fourth Circuit has cast much doubt on whether there is any set of facts under which it would find sentencing manipulation to constitute a meritorious defense. *Id.* (explaining *Jones*, 18 F.3d at 1153). In *Jones*, the Fourth Circuit clearly stated that it was not outrageous for law enforcement officers "to attempt to bargain with a seller of narcotics into selling an amount which constitutes a crime for the sole purpose of obtaining a conviction." 18 F.3d. at 1155. The Fourth Circuit went on to say that it was "not outrageous for the government to continue to purchase narcotics from willing sellers even after a level of narcotics relevant for sentencing purposes has been sold." *Id.*

These are the exact activities Glasgow complains of in this case. While it is true that the investigation in this case spanned a four year period, the Court cannot conclude that this was

15

outrageous conduct that violates due process. The Court finds it significant that the majority of

the undercover transactions in this investigation took place during a one year period, and all of

the crimes of which Glasgow was convicted occurred in a five month period, from February 3,

2011, to June 28, 2011. Thus, the fact that the investigation continued for several more years has

no effect on Glasgow's sentence. Further, Glasgow has not pointed to any evidence that

specifically demonstrates that the undercover officers were attempting to increase Glasgow's

sentence by, for example, trying to get him to sell some threshold amount of controlled

substances. The Court need not evaluate the government's motivation in extending its

investigation and waiting to bring charges against Glasgow and his co-conspirators for several

years. *Id.* ("We decline to impose a rule that would require the government to come forward

with a purpose or motivation, other than its responsibility to enforce the criminal laws of this

country, as a justification for an extended investigation or for any particular step undertaken as

part of an investigation. We also decline to adopt a similar rule that would require district courts

to speculate as to the motives of, or to ascribe motives to, law enforcement authorities."). While

the government's decision to defer its prosecution of Glasgow might have been unusual, the

Court does not find it was so outrageous as to violate due process.

### F. Whether Mr. Glasgow withdrew from the conspiracy as a matter of law

Glasgow next argues that he should be acquitted of Count One, which charges that

Glasgow participated in a conspiracy to distribute controlled substances, because he withdrew

from the conspiracy. Count One specifically charges that "[f]rom in and around September 2010

to on or about May 28, 2015," Glasgow, Mayson, and Mbuenchu, "did unlawfully, knowingly,

and intentionally combine, conspire, confederate, and agree with each other and with other

persons known and unknown to the grand jury" to "knowingly, intentionally, and unlawfully

16

distribute" controlled substances. Glasgow insists that he withdrew from the conspiracy because he had a "falling out" out with Mayson in 2011 during which Mayson pulled a gun on him. Thereafter, the two no longer spoke and thus no longer conspired. Even if this argument is true, that Glasgow did withdraw from the conspiracy, there is still sufficient evidence to find Glasgow guilty of Count One.

"To convict a defendant of narcotics . . . conspiracy, the Government must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy)." *Smith v. United States*, 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013). Withdrawal from the conspiracy "terminates the defendant's liability for post-withdrawal acts of his co-conspirators, but he remains guilty of conspiracy." *Id.* Glasgow admits, and the evidence shows, that he conspired with Mayson until at least June 28, 2011. Thus, Glasgow is guilty of conspiracy up until that point. As none of the charged crimes occurred after that date, even if Glasgow did withdraw from the conspiracy, such a finding would not affect his convictions or his sentence in any way. The Court, therefore, finds that Glasgow was properly convicted of Count One, even if he did withdraw from the conspiracy.

### G. Additional arguments Defendant Glasgow wishes to make

Glasgow asked his counsel to make three additional arguments in this Motion for Acquittal. First, Glasgow argues that the prosecutor improperly referred to his testimony as not credible in closing arguments. Second, Glasgow argues that the inducement instruction was improper and that the jury should have been instructed that he could not have been convicted of conspiring with the government. Third, Glasgow argues that his trial counsel was ineffective.

None of these arguments are proper in a Rule 29 motion because they do not relate to whether the evidence was sufficient to convict him. The first two of these arguments are properly raised in a motion for a new trial or on appeal. The third argument is properly raised in a § 2255 motion. *See United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999). The Court thus need not address these arguments further now.

## IV. Conclusion

As outlined above, the Court does not find any of Glasgow's arguments persuasive. The Court also finds that there was sufficient evidence presented at trial for a rational trier of fact to convict the Defendant on all counts. The Court, therefore, finds good cause to DENY the Motion for Acquittal. An appropriate Order will issue.

April 21 2016
Alexandria, VA

/s/
Liam O'Grady
United States District Judge

18